412 So.2d 720 (1982)
Otis HIGDON, Plaintiff-Appellee,
v.
ORKIN EXTERMINATING COMPANY, INC., Defendant-Appellant.
No. 8713.
Court of Appeal of Louisiana, Third Circuit.
March 10, 1982.
Rehearing Denied April 29, 1982.
*721 Guglielmo & Lopez, James C. Lopez, Opelousas, for defendant-appellant.
Morrow & Morrow, James P. Ryan and Patrick C. Morrow, Opelousas, for plaintiff-appellee.
Before DOMENGEAUX, SWIFT and LABORDE, JJ.
DOMENGEAUX, Judge.
This is a jury suit for property damage (resulting from termite infestation) to the home of plaintiff-appellee, Otis Higdon, located in Krotz Springs, Louisiana. The defendant-appellant, Orkin Exterminating Company, Inc. (Orkin), appeals from the jury verdict awarding plaintiff judgment in the amount of Seventy Thousand and no/100 ($70,000.00) Dollars, plus interest, costs, and expert fees. We amend in part and affirm.
On appeal defendant contends that the jury erred in: (1) granting judgment in favor of plaintiff; and (2) awarding plaintiff judgment in excess to the amount allowed by law. Additionally, appellant contends that the trial judge erred in (3) failing to render a remittitur or alternatively a new trial; and (4) failing to give certain jury instructions requested by it.
On January 15, 1976, plaintiff entered into a subterranean termite agreement with Orkin wherein Orkin agreed to protect plaintiff's home against invasion and infestation by subterranean termites. The plaintiff's premises were inspected, and a graph containing certain references to treating specifications was prepared showing the location of the termites and the termite damage to plaintiff's home. Those references were used by a representative of Orkin who actually treated the premises on January 16, 1976.
In June of 1978, plaintiff discovered live termites and termite damage in several areas of his home, and called Orkin to investigate. Norris Richard, Orkin's Opelousas supervisor, responded to plaintiff's request, but reported that he found no live termites upon inspection. Plaintiff's problem persisted, and in November of 1978, he contracted with Ferris Habbit, another pest control operator, to retreat his home. Thereafter, plaintiff filed a claim for damages with Orkin. Orkin rejected plaintiff's claim contending that the damage to plaintiff's home predated the contract and treatment by Orkin, and further contending that plaintiff failed to maintain the condition of his home in accordance with the contract provisions, therefore voiding any liability on Orkin's part. This suit followed.
Our jurisprudence is well settled that questions of fact are generally left to the trier of fact, and their findings should not be disturbed unless they are clearly wrong or manifestly erroneous. Canter v. Koehring Company, 283 So.2d 716 (La.1973), and Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
*722 Defendant's first contention is that the jury erred in casting it in judgment because the evidence clearly shows that most of the termite damage predated plaintiff's contract with Orkin, and furthermore, Orkin is relieved of any liability due to moisture conditions which existed on the premises. We do not agree.
The pertinent provisions of the Orkin contract "General Terms and Conditions" provide as follows:
"GENERAL TERMS AND CONDITIONS
1 It is agreed that under this contract, ORKIN is not responsible for the repair of visible damage existing as of the date of this contract except as such damage is described on the Graph and Specifications and for which a specific charge for the repair of the same is made. It is possible that damage may, as of the date of this contract, exist in unexposed areas of the structure or in areas which are inaccessible to visible inspection. For this reason ORKIN cannot guarantee that the damage disclosed by visual inspection of the premises (and which is indicated on the Graph and Specification) represents the entirety of the damage which may exist as of the date of initial treatment. It is specifically understood, therefore, that ORKIN shall not be responsible for the repair of any damage which existed in areas or in structural members which were not accessible for visual inspection as of the date of this contract.
* * * * * *
11. If moisture and/or structural conditions which are conducive to Subterranean Termites are subsequently found to exist, then ORKIN shall be relieved of any and all liability for damage repairs."
Several witnesses testified concerning their opinion as to when the termite damage took place. Berkman Manuel, a former employee of Orkin, made the initial inspection, and drew a graft representing the plaintiff's home. Mr. Manuel stated that it was the policy of Orkin to inspect both the interior and the exterior of the home when making the initial inspection. The reason for the inspection is to note any old damage (on the graft) before the contract is consumated between the parties.[1] In spite of this policy Mr. Manuel testified that he "slipped" inasmuch as he did not inspect the interior of plaintiff's home. Mr. Manuel further testified that he completely inspected the underneath side of the house by taking a screwdriver and probing the sills, and the only place he found any old termite damage and/or active infestation was underneath the bathroom area.
An inspector for the Louisiana Instructional Pest Control Commission, Mancil Smith, inspected plaintiff's home in January of 1978. He testified that if someone was under the house crawling in January of 1976, a great deal of the termite damage, if then existing, would have been visible to the naked eye. Jimmy Arceneaux, another inspector for the Louisiana Structural Pest Control Commission, likewise testified that this alleged previous termite damage would have been visible upon inspection in 1976. As previously mentioned, however, no termite damage, other than the active infestation reported in the bathroom area, was noted by Orkin just prior to its treatment to plaintiff's residence.
In June of 1978, approximately two and one-half years after Orkin's treatment, plaintiff became aware that several areas of his home had become reinfested with termites. Plaintiff and Marshall Schnexayder, a local contractor, both testified that they found live termites in the front porch area as well as in the rear of plaintiff's home. Upon contacting Orkin, one of its employees responded to plaintiff's complaint, and, according to plaintiff, retreated the area under plaintiff's porch. Subsequently, in November of 1978, plaintiff contracted with Ferris Habbit, a Lafayette *723 pest controller, to alleviate the continuing problem he was having with live termites. Mr. Habbit testified that he inspected plaintiff's home, and discovered active termite infestation in four or five areas. Mr. Habbit treated plaintiff's home in November, 1978, from which time all active infestation in plaintiff's home has ceased.
Although defendant produced some expert testimony alleging that the termite damage, at issue in this suit, represents some five to eight years of active infestation, therefore suggesting that it existed prior to Orkin's treatment, we find no manifest error on the part of the jury in concluding that such damage did not predate the initial Orkin treatment.
As already mentioned several experts both on behalf of the plaintiff and defendant testified that if the termite damage pre-existed the Orkin contract then it would have been visible during the defendant's 1976 inspection. Defendant's expert, Mr. Arceneaux, also added that if a 1976 pretreatment inspection revealed no other active infestation other than that under the bathroom area, and two years later live termites were found, then this infestation would have occurred after the initial treatment. Of particular importance also is the fact that defendant's experts differed as to the amount of time required to cause damage to this extent. Finally, these same experts' opinions are based on the proposition that only two colonies of termites (one in the front of the house and one in the back) were involved in the destruction, even though no evidence, either in support or deference of this proposition, was produced at trial.
Defendant's second contention is that it should be relieved of liability due to plaintiff's failure to eliminate all moisture condition in his home as required by paragraph 11 in the Orkin agreement. No less than four witnesses testified that they inspected plaintiff's home in the latter part of 1978, and at that time there was no visible water damage or adverse moisture conditions. Although several of defendant's witnesses testified to the presence of water damage in the plaintiff's home, their observations were made in 1980, just prior to trial and long after the termite damage had ceased. Considering that all active infestation was terminated by Mr. Habbit's treatment in November of 1978, and no water damage existed up until that time, we cannot say that the jury was clearly wrong in concluding that the deteriorating condition of plaintiff's home created by the termite damage eventually led to the alleged water damage (i.e., moisture in the home) rather than vice versa. In fact all of the evidence establishes that there was no water damage prior to the effective treatment by Mr. Habbit.
After a three day trial the jury rendered a general verdict in favor of plaintiff in the amount of $70,000.00. For the reasons hereinafter stated, we feel that the maximum award allowable under the facts presented would be $65,879.00.
The award of quantum is a factual finding, which should not be disturbed unless it is clearly shown that the trier of fact abused its discretion. See Reck v. Stevens, 373 So.2d 498 (La.1979) and the cases cited therein. Upon close review of the record, we find that the jury abused its discretion in awarding damages in excess of that proved at trial.
Both plaintiff and defendant introduced two experts whose testimony attempted to establish the cost of repairing and/or rebuilding plaintiff's home. Plaintiff's witnesses, Messrs. Schexnayder and Ellis, both testified that because of the extent of the damage known, coupled with the possible hidden damage, it would be economically practical to tear down plaintiff's existing home and rebuild rather than attempting to repair the termite ridden premises.[2] Defendant's expert contractors, Messrs. Blum and Amy, on the other hand, were of the *724 opinion that plaintiff's home could be repaired or in any event rebuilt for much less than plaintiff proposes.
In view of the award granted, it is obvious that the jury adopted the testimony of Messrs. Schexnayder and Ellis to determine that it is not practical to repair plaintiff's home. Such a finding is supported by the record, and, as such, is within the jury's discretion. The amount of award, however, is not.
Both Mr. Schexnayder and Mr. Ellis are well acquainted with the cost of building in the Krotz Springs area. They both agree that the cost of building plaintiff a new home would be approximately $63,000.00,[3] but their opinions differ as to the cost involved in removing plaintiff's old home. Mr. Schexnayder feels that it can be razed for approximately $2,000.00 whereas Mr. Ellis estimates that it can be done for approximately $2,500.00. Mr. Blum and Mr. Amy's estimates are much lower than those offered by Mr. Schexnayder and Mr. Ellis, however, it is well within the jury's prerogative to differentiate between the witnesses' opinions and adopt those which they feel are the most credible. Again, the award granted reflects that the jury gave greater weight to the testimony of Messrs. Schexnayder and Ellis.
The only other damages proved at trial were the additional $379.00 of expenses incurred for the termite treatment by Mr. Habbit. We feel that the record clearly shows that had Orkin properly treated plaintiff's home the first time, Mr. Habbit's services would not have been required. Presuming we adopt Mr. Ellis' $65,000.00 estimate for razing plaintiff's home and rebuilding, coupled with the added $379.00 treatment expense of Mr. Habbit, the maximum award supported by the record, which could be awarded by the jury, would be $65,879.00. Inasmuch as the jury verdict surpasses this amount it should be reduced accordingly.
Orkin further contends that the judgment awarded plaintiff is excessive because it fails to take into consideration any adjustment for depreciation.
On the third day of trial, and after plaintiff had rested, counsel for defendant informed plaintiff's counsel of his intention to call another witness in addition to those agreed to at the pre-trial arrangements. This witness was to testify concerning his opinion on the depreciation of the plaintiff's premises. Plaintiff's objection to the introduction of this witness' testimony was sustained by the trial judge. Defendant now contends that in so holding the trial judge committed manifest error in excluding this testimony.
An orderly disposition of each case and avoidance of surprise are inherent in the theory of pre-trial procedure and are sufficient reasons for allowing a trial judge to require adherence to pre-trial order in conduct of an action. Eanes v. McKnight, et al, Fortenberry, et ux v. McKnight, et ux, 265 So.2d 220 (La.1972); Brown v. Hawkins, 244 So.2d 896 (La.App. 1st Cir.1971).
Although no written pre-trial order was prepared in this suit, counsel did exchange the names of the witnesses following the court's instruction to do so. The district judge was of the opinion that to allow defendant's counsel to deviate from the pre-trial arrangements so late in the trial would be prejudicial to the plaintiff. We conclude that the district judge committed no error or at least did not abuse his discretion in holding that Orkin was bound by the stipulations made in pre-trial arrangements. Therefore, the record is void of any evidence relative to the applicability of depreciation, leaving the jury without a standard to apply.
Orkin's claim that the award should reflect the fact that plaintiff did not act to minimize his damages is without merit. Plaintiff is disabled with a heart condition. He and his wife were living on social security income of less than $600.00 per month. Certainly it would not have been feasible or *725 advisable for Mr. Higdon to attempt to go out and repair the damages himself. All the testimony indicates that plaintiff acted immediately upon discovering that his home was infested with termites. He contacted Orkin at once, and still not satisfied, he contracted with another exterminator to prevent further damage. Furthermore, plaintiff attempted to get a HUD grant in 1978 to have repairs made, but was turned down when contractors bidding for the project realized the extent of termite damage present. We conclude that the jury was not clearly wrong in deciding that Mr. Higdon made every reasonable attempt to minimize his damages during this ordeal.
The trial court has wide discretion in determining whether a remittitur should be required as an alternative to a new trial. Fontenot v. Fidelity Casualty Company of New York, 217 So.2d 702 (La.App. 3rd Cir. 1969). Likewise, the granting or refusal of a motion for a new trial based solely on discretionary grounds is within the discretion of the trial judge, and his actions will not be disturbed on appeal unless it clearly appears that the trial judge abused his discretion. Hardy v. Kidder, 267 So.2d 582 (La.App. 3rd Cir. 1972), affirmed 292 So.2d 575 (La.1974). Insofar as our opinion reflects an adjustment in the amount of recovery, any error on the part of the trial judge in refusing to render a remittitur has been cured herein. Considering the wide discretion afforded the trial judge in granting or denying an application for a new trial, we find that the trial judge did not clearly abuse his discretion in refusing to grant defendant this relief.
Defendant's final assignment of error is that the trial court erred in not giving certain jury instructions requested by it, more particularly defendant's special instructions numbers 4, 5, and 7.
The trial judge in refusing to give defendant his jury instruction number 4, indicated that he was of the opinion that the jury instruction was included in the charges given. We agree with the trial judge that the subject matter of instruction number 4 was sufficiently covered by defendant's special instruction number 3, which was given to the jury by the trial judge, and therefore, properly left out of the jury charges. Holder v. Gill and Davidge, 391 So.2d 1220 (La.App. 1st Cir. 1980).
Defendant's special instructions number 5 and 7 read as follows:
"DEFENDANT'S REQUESTED JURY INSTRUCTION NO. 5
If you find that the contract provides that Orkin is responsible to repair termite damage to the house only if there are live termites present when the damage is discovered, then you must find that live termites were present when the damage was discovered in order to hold Orkin responsible for the repair of such damage.
DEFENDANT'S REQUESTED JURY INSTRUCTION NO. 7
If you should find that moisture, structural conditions, or defects which resulted in water leakage were conducive to the development of termite activity, then Orkin has no liability for damage repairs. (Contract Provision)."
The source of these two special instructions is the Orkin policy itself which was introduced at trial. We find that if the trial judge erred in failing to so charge the jury that error was harmless. As discussed in our opinion above, both plaintiff and Mr. Schexnayder testified that they found live termites in the front porch area as well as in the rear of the house. Mr. Habbit testified that when he inspected plaintiff's home he located active infestation in four or five areas of the premises. Although Mr. Habbit did not find any live termites in the front porch area, his inspection took place after an Orkin employee had retreated this area in the early part of 1978.[4] We feel that there is ample evidence in the record *726 indicating that live termites were present in the several areas of plaintiff's home where damage was discovered.
The same is true for defendant's instruction number 7. All of the testimony solicited at trial, as we have discussed above, reveals that any alleged water damage or moisture condition did not exist until well after the successful treatment of plaintiff's home by Mr. Habbit. As such, the record simply does not support a finding that any leakage or moisture condition existed during any active infestation which could have been conducive to the development of termites.
For the above and foregoing reasons the judgment of the trial court is reduced from Seventy Thousand and no/100 ($70,000.00) Dollars to Sixty-Five Thousand, Eight Hundred Seventy-nine and no/100 ($65,879.00). Costs on appeal are to be assessed one fourth (¼) against plaintiff-appellee, Otis Higdon, and three-fourths (¾) against defendant-appellant, Orkin Exterminating Company, Inc.
AFFIRMED, AS AMENDED.

ON REHEARING
Since our original decision has been rendered, attorney for defendant-appellant has called our attention to a mathematical or typographical error contained therein.
We conclude that the error was typographical and concerns the figure of $65,000.00 contained on the first line of page 8 of the decision. That figure should be $65,500.00.
We find no mathematical error. The typographical error referred to herein does not affect the outcome of the case and consequently, with this correction, the rehearing is denied.
NOTES
[1] Mr. Manuel, as well as the other Orkin representatives who testified at trial, candidly admitted that one of the primary purposes of this pre-treatment inspection is to note any old damage on the graph so that should a claim subsequently arise Orkin could escape liability for it.
[2] Both Mr. Schexnayder and Mr. Ellis estimated that the cost of repairing plaintiff's home would be in the neighborhood of $89,000.00. In their opinion the cost of repairing the premises greatly surpasses the cost of building a new home.
[3] This estimate represents building a 1,800 square foot home (approximately the size of plaintiff's home) at $35.00 per square foot totaling $63,000.00.
[4] Plaintiff testified that after he discovered the termite damage and active infestation in the early part of 1978 he contacted Orkin. Plaintiff further testified that a day or so later one of Orkin's employees came to his residence and sprayed the porch area, which, at that time, was infested with live termites.